No. 25-20415

# In the United States Court of Appeals
# for the Fifth Circuit

Quadvest, L.P.,

Plaintiff – Appellant

v.

San Jacinto River Authority,

Defendant – Appellee

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division
Civil Action No. 4:19-CV-4508

BRIEF OF APPELLANT

J. David Rowe
  Texas Bar No. 00794564
  drowe@munckwilson.com
MUNCK WILSON MANDALA, LLP
807 Las Cimas Parkway, Suite 300
Austin, Texas 78746
(737) 201-1600

Aaron C. Dilbeck
  Texas Bar No. 24095723
  adilbeck@munckwilson.com
MUNCK WILSON MANDALA, LLP
2000 McKinney Ave., Suite 1900
Dallas, Texas 75201
(972) 628-3694

Kurt Kuhn
  Texas Bar No. 24002433
  Kurt@KuhnAppeals.com
KUHN LAW PLLC
7000 N. MoPac Expy., Suite 315
Austin, Texas 78731
(512) 476-6005

COUNSEL FOR APPELLANT

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Plaintiff – Appellant:                                Quadvest, L.P.

Trial and Appellate Counsel for
Plaintiff – Appellant:                                Kurt Kuhn
   Texas Bar No. 24002433
   Kurt@KuhnAppeals.com
KUHN LAW PLLC
7000 N. MoPac Expy., Suite 315
Austin, Texas 78731
(512) 476-6005

J. David Rowe
   Texas Bar No. 00794564
   drowe@munckwilson.com
MUNCK WILSON MANDALA, LLP
807 Las Cimas Parkway, Suite 300
Austin, Texas  78746
(737) 201-1600

Aaron C. Dilbeck
   Texas Bar No. 24095723
   adilbeck@munckwilson.com
MUNCK WILSON MANDALA, LLP
2000 McKinney Ave., Suite 1900
Dallas, Texas  75201
(972) 628-3694

Defendant – Appellee:          San Jacinto River Authority

Trial and Appellate Counsel for     R. Paul Yetter
Defendant – Appellee:           pyetter@yettercoleman.com
                              Texas Bar No. 22154200
                        Constance H. Pfeiffer
                              cpfeiffer@yettercoleman.com
                              Texas Bar No. 24046627
                        James E. Zucker
                              Texas Bar No. 24060876
                              jzucker@yettercoleman.com
                        Justin S. Rowinsky
                              Texas Bar No. 24110303
                              jrowinsky@yettercoleman.com
                        Luke A. Schamel
                              Texas Bar No. 24106403
                              lschamel@yettercoleman.com
                        YETTER COLEMAN LLP
                        811 Main St., Suite 4100
                        Houston, Texas 77002
                        (713) 632-8000

/s/ Kurt Kuhn
Kurt Kuhn

*Attorney of Record for Plaintiff-Appellant*

ii

**STATEMENT CONCERNING ORAL ARGUMENT**

Quadvest believes oral argument would be helpful to the Court to understand and resolve this appeal. Quadvest, an investor-owned water utility, brought this action against the San Jacinto River Authority, a state entity, alleging SJRA violated federal antitrust law by entry into and enforcement of its Joint GRP and provisions of the Parties' GRP Contract related to the wholesale of water in Montgomery County, Texas. During SJRA's prior appeal regarding its claim of state action immunity, the Court held the Texas Legislature did not authorize SJRA to displace competition in the wholesale water market.[1] This appeal turns on whether SJRA's entry into and enforcement of the challenged GRP Contract provisions improperly did so.

This appeal will focus on several complex legal conclusions reached by the district court that determined the outcome below, including antitrust standing, whether the Joint GRP and GRP Contract are a legal collaboration between competitors, the proper standard of review, and whether purported benefits of the restraints override antitrust concerns. The case was tried to the bench over ten days, after which the court adopted findings of fact and conclusions of law submitted by SJRA that stretch over 100 pages. The record on appeal is more than 28,000 pages. Despite the best efforts at briefing by both sides, legal and factual questions will likely remain. Oral argument would provide the Court with an opportunity to resolve any questions.

---

[1] *Quadvest, L.P. v. San Jacinto River Auth.*, 7 F.4th 337, 347-48 (5th Cir. 2021).

## TABLE OF CONTENTS

Certificate of Interested Persons ................................................................ i

Statement Concerning Oral Argument ....................................................... iii

Table of Authorities ................................................................................... vi

Statement Regarding Jurisdiction .............................................................. 1

Issues Presented for Review ....................................................................... 2

Statement of the Case ................................................................................ 3

    A.    Wholesale water in Montgomery County is supposed to be sold in a competitive market, historically by competing groundwater utilities. ........... 3

    B.    In 2010, with help from the Lone Star Groundwater Conservation District, SJRA found a way "to create a market" and force Montgomery County to transition to surface water. ...................................... 6

    C.    SJRA used its Joint GRP and GRP Contract provisions to equalize the price of water between competitors and allocate the market, which dramatically raised water prices while lowering output. ............................... 10

        1.    Pumpage Fees: Water Price Neutrality Through Equalized Costs .......... 10

        2.    Market Allocation: SJRA dictated which customers it took and claimed all future new or increased water demand. .................................. 12

        3.    SJRA's GRP Contract provisions dramatically increased the cost of water in Montgomery County, reduced output, and stifled competition. ......................................................................................... 14

    D.    SJRA oversold the urgency of building its surface water plant, and the Lone Star conservation rules were invalidated. .............................................. 16

    E.    The district court found no antitrust violation, treating the GRP Contract as unilateral action, and believing that the restraints are procompetitive and Quadvest is better off for joining the scheme. ............. 17

Summary of Argument ................................................................................ 20

Argument .................................................................................................... 22

I.      The judgment rests on a series of legal conclusions regarding antitrust law that the Court reviews de novo. .............................. 22

II.     Quadvest's lost profits and impaired competitive bidding is the type of antitrust injury the law seeks to prevent, and provide standing without regard to any benefit of joining the Joint GRP. .................................. 22

III.    The Joint Group and GRP Contract provisions are an illegal concerted action joining 80% of the wholesalers in Montgomery County to fix water prices and allocate the market. ........................................ 27

IV.     The cost equalization and mandatory connection provisions of the GRP Contract are horizontal price-fixing and market allocation agreements that are per se unlawful. ...................................... 33

        A.      The Joint GRP and GRP Contract create horizontal restraints on the participating utilities. ...................................... 33

        B.      The pumpage fee and rate provisions—designed to create "price neutrality"—are per se illegal horizontal price fixing. ..................... 36

        C.      The Mandatory Connection and Surface Water Put Option provisions—allowing SJRA to dictate who it sells water to—are per se illegal horizontal market allocation. ............................ 39

        D.      The price-fixing and market allocation restraints were not necessary to create a new product and cannot escape the per se rule. ................. 43

        E.      If reviewed under the rule of reason, a quick look shows that SJRA's GRP Contract price-fixing and market allocation restraints violate §1. .............................. 49

V.      The undisputed evidence shows SJRA's Joint GRP and GRP Contracts has a substantial effect on interstate commerce. ....................... 52

Conclusion ............................................................ 56

Certificate of Service ................................................ 58

Certificate of Compliance ............................................ 59

TABLE OF AUTHORITIES

CASES

*Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n,*
  776 F.3d 321 (5th Cir. 2015)............................................................... 29

*Am. Needle, Inc. v. Nat'l Football League,*
  560 U.S. 183 (2010).....................................................................passim

*Arizona v. Maricopa Cnty. Med. Soc'y,*
  457 U.S. 332 (1982).....................................................................passim

*Atl. Richfield Co. v. USA Petroleum Co.,*
  495 U.S. 328 (1990).................................................................25, 50

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.,*
  9 F.4th 1102 (9th Cir. 2021).............................................................. 48

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
  441 U.S. 1 (1979) ................................................................................ 45

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977)............................................................................ 23

*Cargill, Inc. v. Monfort of Colorado, Inc.,*
  479 U.S. 104 (1986).....................................................................26, 27

*Chandler v. Phoenix Servs., L.L.C.,*
  45 F.4th 807 (5th Cir. 2022).............................................................. 22

*Copperweld Corp. v. Independence Tube Corp.,*
  467 U.S. 752 (1984).................................................................28, 30, 32

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.,*
  123 F.3d 301 (5th Cir. 1997).............................................................. 23

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,*
  528 U.S. 167 (2000).................................................................41, 42

*Gainesville Utils. Dep't v. Florida Power & Light Co.,*
  573 F.2d 292 (5th Cir. 1978).............................................................. 40

*Greene v. Gen. Foods Corp.*,
    517 F.2d 635 (5th Cir. 1975)..................................................................25, 26

*Gulf Coast Hotel-Motel Ass'n v. Miss. Gulf Coast Golf Course Ass'n*,
    658 F.3d 500 (5th Cir. 2011)..................................................53, 54, 55

*Hess Corp. v. Schlumberger Tech. Corp.*,
    26 F.4th 229 (5th Cir. 2022) ....................................................... 22

*Hosp. Bldg. Co. v. Trustees of Rex Hosp.*,
    425 U.S. 738 (1976) ................................................................ 54

*Jayco Sys., Inc. v. Savin Bus. Machs. Corp.*,
    777 F.2d 306 (5th Cir. 1985) ..................................................... 26

*Jebaco, Inc. v. Harrah's Operating Co.*,
    587 F.3d 314 (5th Cir. 2009) ..................................................... 26

*McLain v. Real Estate Bd. of New Orleans*,
    444 U.S. 232 (1980) ................................................................ 53

*N. Tex. Specialty Physicians v. F.T.C.*,
    528 F.3d 346 (5th Cir. 2008) ..................................................... 35

*Nat'l Soc. of Prof'l Eng'rs v. U.S.*,
    435 U.S. 679 (1978) ...........................................................36, 52

*NCAA v. Alston*,
    141 S.Ct. 2141 (2021) ........................................................49, 50, 51

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) ..........................................................passim

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*,
    56 F.4th 1026 (5th Cir. 2023) .................................................... 34

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) ................................................................ 28

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009) ...........................................................31, 32

*Palmer v. BRG of Ga., Inc.*,
    498 U.S. 46 (1990)................................................................35, 41

*Park v. El Paso Bd. of Realtors*,
    764 F.2d 1053 (5th Cir. 1985)................................................... 52

*Penn. Water & Power Co. v. Consol. Gas, Elec. Light & Power Co.*,
    184 F.2d 552 (4th Cir. 1950)................................................36, 40

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
    392 U.S. 134 (1968)............................................................25, 26

*PharmacyChecker.com LLC v. LegitScript LLC*,
    137 F.4th 1031 (9th Cir. 2025) ................................................. 23

*Pulse Network, L.L.C. v. Visa, Inc.*,
    30 F.4th 480  (5th Cir. 2022) ................................................24, 25

*Quadvest, L.P. v. San Jacinto River Auth.*,
    7 F.4th 337, 347-48 (5th Cir. 2021)........................ iii, 3, 4, 18, 41

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3rd Cir. 1997)..................................................... 30

*Sanger Ins. Agency v. HUB Int'l, Ltd.*,
    802 F.3d 732 (5th Cir. 2015).................................................... 24

*Schlotzsky's, Ltd. v. Sterling Purchasing and Nat. Distribution Co.*,
    520 F.3d 393 (5th Cir. 2008).................................................... 30

*Sporhase v. Nebraska, ex rel. Douglas*,
    458 U.S. 941 (1982).................................................................. 54

*St. Bernard Gen. Hosp., Inc. v. Hosp. Serv. Ass'n of New Orleans, Inc.*,
    712 F.2d 978 (5th Cir. 1983)............................... 32, 53, 54, 55

*Texaco, Inc. v. Dagher*,
    547 U.S. 1 (2006).................................................................30, 47

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017)................................................................. 42

*Tucker v. Gaddis*,
 40 F.4th 289 (5th Cir. 2022)................................................................. 42

*U.S. v. All Star Indus.*,
 962 F.2d 465 (5th Cir. 1992).............................................................. 34

*U.S. v. Am. Airlines Grp. Inc.*,
 121 F.4th 209 (1st Cir. 2024) ............................................................ 51

*U.S. v. Apple, Inc.*,
 791 F.3d 290 (2nd Cir. 2015) ............................................................ 44

*U.S. v. Cadillac Overall Supply Co.*,
 568 F.2d 1078 (5th Cir. 1978)........................................................... 41

*U.S. v. Concentrated Phosphate Export Ass'n*,
 393 U.S. 199 (1968) ........................................................................... 43

*U.S. v. King*,
 660 F.3d 1071 (9th 2011) .................................................................. 55

*U.S. v. Socony-Vacuum Oil Co.*,
 310 U.S. 150 (1940).................................................................... 37, 38

*U.S. v. Suntar Roofing, Inc.*,
 897 F.2d 469 (10th 1990) ................................................................. 39

*U.S. v. Topco Assocs., Inc.*,
 405 U.S. 596 (1972)........................................................................... 39

*U.S. v. U.S. Gypsum Co.*,
 333 U.S. 364 (1948)........................................................................... 22

*U.S. v. W. T. Grant Co.*,
 345 U.S. 629 (1953)........................................................................... 42

*U.S. v. Young Bros., Inc.*,
 728 F.2d 682 (5th Cir. 1984) ............................................................ 53

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
 395 U.S. 100 (1969)..................................................................... 23, 27

**STATUTES**

15 U.S.C. §1 .............................................................................................. 1, 28

15 U.S.C. §26 ............................................................................................ 1, 26

28 U.S.C. §1291 ............................................................................................. 1

28 U.S.C. §2201 ............................................................................................. 1

TEX. WATER CODE §13.144 ............................................................................. 5

TEX. WATER CODE §13.242 ............................................................................. 5

**OTHER AUTHORITIES**

PHILLIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW (4th ed. 2013) ............. 48

U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for Collaborations Among Competitors* (2000) ............................................................... 32, 33, 35

WILLIAM HOLMES & MELISSA MANGIARACINA, ANTITRUST LAW HANDBOOK (Nov. 2023 Update) ............................................................................. 44

## STATEMENT REGARDING JURISDICTION

This is an antitrust action seeking declaratory and injunctive relief brought by Quadvest L.P. against the San Jacinto River Authority under the Sherman Act, 15 U.S.C. §1, and the Clayton Act, 15 U.S.C §26. Quadvest alleges SJRA's entry into and enforcement of its Joint GRP and provisions of the GRP Contract related to the wholesale of water in Montgomery County, Texas, are anticompetitive and violate federal law.[2] The district court had jurisdiction over Quadvest's claim for declaratory relief under 28 U.S.C. §2201, and for injunctive relief under 15 U.S.C. §26.

After a January 2024 bench trial, the court entered a final judgment in favor of SJRA on October 18, 2024.[3] Both Quadvest and SJRA filed timely post-judgment motions that extended the time to file a notice of appeal.[4] The district court disposed of the last such motion on August 21, 2025.[5] Quadvest timely appealed on September 18, 2025.[6] The Court has jurisdiction, under 28 U.S.C. §1291, to review the district court's determination of whether the entry into and enforcement of the Joint GRP and challenged provisions of the GRP Contract violates federal antitrust law.

---

[2] ROA.6497-6532. Quadvest also alleged a §2 attempted monopoly claim, but is not pursuing it on appeal to narrow the issues for review. Woodland Oaks Utility, L.P. was also an original plaintiff, but dismissed its claims. ROA.8114-17.
[3] ROA.13300.
[4] ROA.13301-05, 13309-28.
[5] ROA.13601-03.
[6] ROA.13604-06.

**ISSUES PRESENTED FOR REVIEW**

1.      Does a party have standing to seek injunctive relief under the Clayton Act if it suffered antitrust injuries like lost profits and impaired bidding, or must it also prove it did not benefit overall from the defendant's illegal scheme?

2.      Do the Joint GRP and GRP Contract provisions—which bring together 80 independent public and private water utilities—constitute concerted action within the scope of §1 of the Sherman Act?

3.      Are the GRP Contract pumpage fee and rate provisions, designed to create "price neutrality" between participants, per se illegal horizontal price fixing?

4.      Are the GRP Contract mandatory connection provisions, which allow SJRA to dictate who it sells water to, per se illegal horizontal market allocation?

5.      Should the price-fixing and market allocation restraints be judged under the relaxed ancillary restraints doctrine when they did not create any new product and only allowed participants to sell water at fixed prices and affect the market price?

6.      If reviewed under the rule of reason, can the GRP Contract price-fixing and market allocation restraints survive a quick look when they have no procompetitive benefits but merely seek to prevent competition?

7.      Is the undisputed evidence the GRP Contracts effectively doubled the price of water on participants' customers, including businesses like hotels, hospitals, and restaurants, sufficient to prove SJRA's Joint GRP affected interstate commerce?

## STATEMENT OF THE CASE

Through a series of individual Groundwater Reduction Plan ("GRP") Contracts, SJRA brought together competing utilities—including Quadvest—representing 80% of the water sold in Montgomery County, agreeing to raise prices by equalizing their costs of production and to allocate customers.[7] This Court already held the Texas Legislature did not authorize SJRA to use the challenged GRP Contract provisions to displace competition in the wholesale water market in Montgomery County.[8] On remand, the district court focused on purported economic and environmental benefits of building a surface water treatment plant in Montgomery County. But the proper question is whether SJRA's chosen anticompetitive scheme to do so violates federal antitrust law.

### A. Wholesale water in Montgomery County is supposed to be sold in a competitive market, historically by competing groundwater utilities.

Quadvest and SJRA are both drinking water wholesalers in Montgomery County, Texas.[9] Texas allows for competition in the water market, and there are numerous types of entities that provide water services, including for-profit utilities.[10] SJRA's Joint GRP brought together 80 different water utilities that supply approximately 80% of the water sold in Montgomery County.[11]

---

[7] ROA.14593 (80% of the water market), 14451 (purpose of pumpage fee was to equalize cost of surface water and groundwater), 14476-78 (contract grants SJRA right to mandate surface water connection).
[8] *Quadvest, L.P.*, 7 F.4th at 348.
[9] ROA.13810, 14627.
[10] ROA.13691.
[11] ROA.14646.

Formed in the 1970s, Quadvest is a for-profit, investor-owned water utility that provides wholesale and retail water. While it operates in several counties, Quadvest is based in Montgomery County, which is its primary market. Quadvest sells potable groundwater, which it pumps from its wells. Quadvest sells wholesale potable water to numerous types of entities, including Municipal Water Districts (MUDs).[12]

SJRA is a state entity, created by the Texas Legislature to conserve, control, and utilize the storm and flood waters of the San Jacinto River and its tributary streams.[13] Like Quadvest, SJRA is a water wholesaler in Montgomery County. By volume, SJRA is the largest wholesaler of potable water in the county.[14] SJRA gets its water from a surface water treatment plant, which it owns and operates, and groundwater wells. SJRA provides wholesale water to MUDs, cities, IOUs, and others.[15]

Historically, Montgomery County relied on groundwater for its water supply.[16] To the consumer surface water and groundwater are indistinguishable.[17] But surface water is more expensive because of the infrastructure needed to produce, treat, and deliver it.[18] SJRA's cost to produce surface water in Montgomery County is around

---

[12] ROA.13691-97, 14326, 15120.
[13] *Quadvest, L.P.*, 7 F.4th at 340.
[14] ROA.14485, 14487-88.
[15] ROA.14488, 14502, 14601, 14612, 14707.
[16] ROA.13701, 14505.
[17] ROA.13804, 14625.
[18] ROA.13694-97, 14156.

$7.00 per thousand gallons.[19]   By comparison, the cost for Quadvest to produce, groundwater is about $1.69 per thousand gallons.[20]

Quadvest has never used, nor wanted to use, surface water for its water supply because "everything about surface water is more expensive."[21]   Absent the SJRA pumpage fees at issue in this lawsuit, Quadvest's wholesale contracts—which include profit—charge around $3.70 or $4.00 per thousand gallons.[22]

The regulatory scheme adopted by the Texas Legislature provides for competition between private and public water utilities.  The scheme treats wholesale and retail services differently.  Utilities compete for contracts with developers for the right to sell retail water to customers in a particular geographic area.[23]  To provide retail water, utilities also obtain certificates from the Public Utility Commission of Texas.[24] Wholesale providers are not required to obtain prior approval, and must only give the commission notice of a contract after the fact.[25]

Texas also treats retail and wholesale water rates differently.  On the retail side, rates are regulated and set by the PUC.  But wholesale water sales are not regulated. Instead, wholesalers compete with one another by targeting new neighborhoods and

---

[19] ROA.14455.
[20] ROA.15220.
[21] ROA.13694-97.
[22] ROA.13837.
[23] ROA.13819-11, 13813-14.
[24] TEX. WATER CODE §13.242(a).
[25] TEX. WATER CODE §13.144.

5

existing entities, such as MUDs, that service retail customers.[26]  This includes providing a supplemental water supply if an existing entity wanted additional water.[27]  Rates are negotiated and set by contract, allowing consumers to pit wholesalers against each other to get the best deal.[28]  Negotiating the price for water with potential customers allows wholesalers to compete for business.[29]  Quadvest competes for business with other water utilities all the time.[30]

**B.     In 2010, with help from the Lone Star Groundwater Conservation District, SJRA found a way "to create a market" and force Montgomery County to transition to surface water.**

Since at least the 1980s, SJRA has claimed Montgomery County needs to convert to use 60% surface water.[31]  A study SJRA commissioned at the time concluded there would "likely not be adequate groundwater supplies" and surface water "would likely be the most viable alternative source."  The study said available groundwater would be depleted by 2030.[32]  SJRA is the only entity with the ability to convert Montgomery County to 60% surface water.[33]

But SJRA had a problem: it could not fund the infrastructure necessary for the transition, including building a surface water treatment plant and transmission lines

---

[26] ROA.13694, 13826, 13830, 14488, 14493, 23403, 28110.
[27] ROA.13829, 13832, 13833, 14627.
[28] ROA.13692, 13810-11, 13902, 14386.
[29] ROA.13903.
[30] ROA.14333.
[31] ROA.14172.
[32] ROA.13705-708, 14506.
[33] ROA.14172.

6

needed to deliver water throughout the county.  SJRA estimated the costs would exceed half-a-billion dollars, which it could not fund on its own.  SJRA had no taxing authority, and no authority to levy fees against groundwater users.[34]  Nor could SJRA sell surface water to pay for its infrastructure—it was too expensive.  The president of the Lone Star Groundwater Conservation District, James Spigener, testified that to make conversion financially feasible, "they had to create a market for that."[35]

While SJRA could not regulate groundwater, it found the help it needed in the Lone Star Groundwater Conservation District.  Created by the Texas Legislature in 2001, Lone Star is charged with managing the aquifers under Montgomery County.[36]  After Lone Star was formed, it created a task force along with members from SJRA "to figure out how to convert the county to surface water."[37]

Lone Star could not assess fees, but it did have authority to regulate the aquifer.[38]  In 2003, Lone Star announced the annual sustainable limit of groundwater withdrawal from the Gulf Coast Aquifer, the primary source for Montgomery County, was 64,000 acre-feet.[39]  It reached that number simply by assuming a recharge of approximately 1.1 inch per year, and multiplying it by the total acreage of the county.[40]

---

[34] ROA.14448-50.
[35] ROA.14152, 14204.
[36] ROA.14157-58.
[37] ROA.14172-75.
[38] ROA.14513.
[39] ROA.13710-11, 14158-59.
[40] ROA.13711, 15535.

Lone Star no longer follows the 64,000 acre-feet per year limit.[41]  It now admits there was "not a tremendous basis" to support the number.[42]  At trial, Lone Star's president testified conversion from groundwater in Montgomery County is "not necessary now, by any stretch."[43]  And, SJRA concedes that "[w]hether groundwater will ultimately need to be conserved by limiting pumping remains to be seen."[44]

But Lone Star moved forward, adopting an annual 64,000 per acre-feet limit on groundwater usage in Montgomery County.[45]  It also implemented a 30% reduction rule, requiring by 2016 that every large volume groundwater user (LVGU) reduce production to at least 70% of its 2009 usage.  LGVUs were defined to include anyone who pumped more than 10 million gallons per year, which would include any groundwater seller like Quadvest.[46]  SJRA also qualifies as a LVGU with contracts to provide groundwater to several MUDs.[47]  Failure to comply would subject an LVGU to fines of up to $10,000 per day, per violation.[48]

Lone Star's reduction rule effectively forced LGVUs like Quadvest to agree to a surface water solution.  Quadvest could not afford to pay the fines, nor could it "turn off the spigot" to conserve water.  Quadvest is obligated by existing contracts and

---

[41] ROA.14196.
[42] ROA.15414-15.
[43] ROA.14170,
[44] July 28, 2025 Respondent's Brief on the Merits, at *8, No. 24-0533, in the Supreme Court of Texas.
[45] ROA.14165, 14167, 14191-92.
[46] ROA.13712-13.
[47] ROA.14326, 14451-52, 14503.
[48] ROA.13717-20, 14194.

regulatory rules to provide water to its customers. While some LVGUs could drill into the unregulated Catahoula aquifer, that option was not geographically available to Quadvest.[49] At trial, SJRA admitted it also would not have been able to comply with the reduction rule by conservation or the Catahoula.[50]

However, LVGUs could meet Lone Star's requirements by joining a group to collectively reduce their groundwater pumpage.[51] SJRA proposed LVGUs could join its Joint GRP group, and obtain compliance by funding construction of SJRA's surface water treatment plant.[52] This was not a joint venture. Instead, groundwater participants would simply pay fees to SJRA.[53]

In response, 80 different LVGUs in Montgomery County joined SJRA's GRP.[54] As Ricky Moffett, general manager of the Southern Montgomery County MUD, testified, for an entity with a large demand, one of, if not the most economical way to achieve compliance was to join SJRA's group.[55] With Lone Star's help, SJRA succeeded in creating a market for surface water conversion.

---

[49] ROA.13726-28.
[50] ROA.13771-73, 14451-53.
[51] ROA.14279-80, 14288, 14292.
[52] ROA.14451.
[53] ROA.13791, 13888.
[54] ROA.13725-26.
[55] ROA.15440, 15449-50.

9

**C.    SJRA used its Joint GRP and GRP Contract provisions to equalize the price of water between competitors and allocate the market, which dramatically raised water prices while lowering output.**

SJRA created a joint groundwater reduction plan by developing a joint plan and executing a series of individual contracts with participants—the SJRA GRP Contracts.[56] The individual contracts are expressly tied to the Joint GRP and have identical terms.[57] Through its Joint GRP and the GRP Contracts, SJRA linked 80 groundwater utilities, responsible for approximately 80% of the groundwater usage in Montgomery County.[58] SJRA's GRP Contract provisions dramatically altered the wholesale water market.

**1.    Pumpage Fees: Water Price Neutrality Through Equalized Costs**

SJRA's GRP Contract assesses "pumpage fees" that groundwater participants, like Quadvest, pay SJRA on a monthly basis.  The amount varies, and is calculated using a rate set by SJRA.[59]  Section 6.02 of the GRP Contract sets out the formula:

> For all groundwater pumpage by Participant, Participant shall pay an amount determined by the formula:
>
> $$P \times Q \text{ where:}$$
>
> $P$ is the prevailing fee for groundwater pumpage, per thousand gallons, adopted by the Authority in its Rate Order; and
>
> $Q$ is the quantity of groundwater pumped by Participant, in thousands of gallons during, the calendar month.[60]

---

[56] ROA.14284-93.

[57] ROA.14569-70, 14574-75, 14596, 16244, 16250 §§2.01, 2.02.

[58] ROA.14646.

[59] ROA.13736, 15123.

[60] ROA.16276 §6.02(1).

10

The GRP Contract has a separate formula to calculate the amount SJRA charges participants who receive surface water, using a rate also set by SJRA.[61] The contract expressly requires the pumpage fees be assessed at a rate to equalize participating LVGUs' costs to produce groundwater and SJRA's costs to produce surface water.[62]

By setting the fees this way, SJRA equalizes the production cost of groundwater and surface water for participants. This idea of "price neutrality" is supposed to mean participants neither benefit, nor are penalized, by pumping groundwater or buying surface water. SJRA's intent is to neutralize the cost differences between groundwater and surface water in Montgomery County.[63]

The pumpage fees substantially alter competition between the Joint GRP participants. The cost to produce groundwater is less than $2.00 per thousand gallons, while SJRA's cost for surface water is about $7.00. But the pumpage fees subsidize SJRA's rate for surface water, lowering it to less than $3.00.[64] At the same time, the pumpage fees drastically increase the cost to produce groundwater, which is passed on to customers as higher rates. From 2010 until trial, Quadvest had paid around $30 million in pumpage fees to SJRA. As a result, any competitive advantage Quadvest had as a groundwater producer has been eliminated.[65]

---

[61] ROA.16276 §6.02(2).
[62] ROA.13738, 16251 §2.02(b), 16276-78 §§6.02 6.04.
[63] ROA.14479-80, 14568.
[64] ROA.13811-13, 14455, 14630.
[65] ROA.13811-13, 13836-37, 15123, 15127-28.

SJRA's Jace Houston admits the GRP contract pumpage fee and rate provisions directly impact the rates charged by all 80 participants.

> Q. . . . all those participants that are now under the umbrella of the River Authority, their water rates are directly impacted by this GRP contract; isn't that right?
>
> A. Yes.
>
> Q. Because they are either buying surface water at rates set by the SJRA under the contract or they are paying pumpage fees at rates set by SJRA under the contract?
>
> A. Yes.[66]

### 2. Market Allocation: SJRA dictated which customers it took and claimed all future new or increased water demand.

The GRP Contract provisions also allow SJRA to divide up the market between participants. Using these provisions, SJRA took the largest customers, and dictated surface water would be used for future growth or new demand.

The "Mandatory Connection" provision lets SJRA decide which participants are required to purchase its surface water and in what amount. It provides that SJRA, "shall decide when, if ever, Participant must connect to the Project."[67] The Surface Water Put Option lets SJRA decide the quantity the participant is required to take, provides authority to raise the amount, and creates fines for a participant's failure to comply.[68]

---

[66] ROA.14482-83.
[67] ROA.16263 §4.05.
[68] ROA.16267-68 §4.09 (a), (b), (d).

In 2015, SJRA's water treatment plant came online, and SJRA converted existing groundwater users.[69] SJRA dictated the largest groundwater participants would buy its surface water.[70] The Joint GRP specified that "treated surface water will be provided to the City of Conroe, The Woodlands, and the high-growth areas along the I-45 corridor initially," and "those high demand areas receiving surface water will use it as their base load demand and peak off to groundwater only as necessary."[71]

As designed, the Joint GRP and GRP Contract also required that, while groundwater production from participants would remain level, all future increased demand would be satisfied by surface water sold by SJRA.[72]



SJRA Joint GRP Groundwater Reduction Strategy

---

[69] ROA.13785-86, 14706.
[70] ROA.15450-51.
[71] ROA.14284-85, 25121.
[72] ROA.7240, 14705, 17197.

13

As demonstrated by this chart from the Joint GRP, as demand went up, the groundwater usage would remain below the participant's 2016 regulatory limit, and increased or new demand would be satisfied by SJRA.[73]

### 3. SJRA's GRP Contract provisions dramatically increased the cost of water in Montgomery County, reduced output, and stifled competition.

The GRP Contract gives SJRA the ability to set pumpage fees on the participants without regulatory review. The same is true for setting the price of surface water.[74] Given that participants supply 80% of the water in Montgomery County, the price of water in the county is different because of the GRP Contracts.[75] With SJRA given control, the price "almost doubled because it reduced competition."[76] Quadvest's customers now pay more in passed through pumpage fees than for the actual water.[77]

In 2010, SJRA set the pumpage fees at a comparatively small amount, requiring participants to pay 50 cents per 1,000 gallons. But the amount went up repeatedly with annual rate orders. At the time of trial, SJRA required groundwater participants pay $2.99 per thousand gallons.[78] Participants, like Quadvest, pass those fees on to groundwater customers, which increases their water bill.[79]

---

[73] ROA.14645-49, 14704-06. At trial, SJRA's Houston admitted that was SJRA's plan, but claimed it could not now enforce it with Lone Star's rule invalidated. ROA.14956-57.

[74] ROA.15046, 16276 §6.02(a).

[75] ROA.13838-39.

[76] ROA.13814.

[77] ROA.15267.

[78] ROA.13864-66.

[79] ROA.15127-29.

SJRA's Jace Houston admitted that, as a result of the GRP Contract provisions, "all customers of the 80 participants have had increased water bills."[80] He testified the GRP Contracts gave SJRA the ability to affect the price all participants' customers pay.[81] Houston agreed that, as a result of the pumpage fees, every consumer in Montgomery County getting water from a Joint GRP participant—both residential and commercial—is paying more for water because of the GRP Contract.[82]

As the price of water doubled, customers used less.[83] SJRA's economist, Michael Williams, explained that "anyone's demand for water depends, in part, on the price." As price goes up, demand goes down.[84] Compared to 2009, before the pumpage fees, in 2021, Quadvest's customers are using, on average, 22% less water per month.[85] SJRA's Houston admitted the Joint GRP and GRP Contracts raised the price of groundwater in Montgomery County and reduced demand—at both the retail and wholesale level, resulting in lower revenue and lower profits.[86] With the drop in demand, Quadvest suffered around $3.7 million in lost profits.[87]

Moreover, SJRA's production of surface water did not increase output overall. Instead, as surface water was forced into the market, it caused a corresponding drop in

---

[80] ROA.14704.
[81] ROA.14593-94.
[82] ROA.14635-37.
[83] ROA.13787.
[84] ROA.15787.
[85] ROA.15267-68.
[86] ROA.14640-43.
[87] ROA.13806-07, 15270-71.

the sale of groundwater.[88]  It simply added another resource to serve the existing demand—displacing groundwater with surface water.[89]  Displacing an existing output with another is not an increase in output.[90]

The mandatory connection and pumpage fees also harmed Quadvest's ability to fairly compete for new wholesale agreements.  The added pumpage fees erased the price advantage Quadvest would otherwise have had in negotiations.  SJRA can also use pumpage fees to pay for capital infrastructure.[91]  The GRP Contracts tied up potential large customers—like the City of Conroe and other municipalities—to whom Quadvest could otherwise sell supplemental water.[92]  And Quadvest lost out on at least one contract that ultimately went with SJRA.[93]  The GRP Contract provisions put Quadvest at a competitive disadvantage to get business.[94]

### D.    SJRA oversold the urgency of building its surface water plant, and the Lone Star conservation rules were invalidated.

At the time the Joint GRP was created, Lone Star and SJRA did a good job convincing people Montgomery County was in a critical water shortage.  They sold the idea the "wells are drying up in Montgomery County," and conversion to surface water was necessary to preserve the aquifer.[95]  SJRA's Jace Houston published an article

---

[88] ROA.15156-58.
[89] ROA.15207-08.
[90] ROA.15351-52.
[91] ROA.13812-13.
[92] ROA.13832-34.
[93] ROA.13835.
[94] ROA.14374.
[95] ROA.14154.

claiming, "[w]e are literally draining the Montgomery County well dry." But Lone Star now agrees that was not a truthful statement[96] Even though it abandoned the limit, "the aquifer is still completely full."[97]

In 2015, a coalition of cities and private utilities, including Quadvest, filed a state court action challenging Lone Star's groundwater reduction rule. In 2019, after Lone Star withdrew an appeal, the court entered a final judgment declaring the rule had been adopted without legal authority and was void.[98]

### E.   The district court found no antitrust violation, treating the GRP Contract as unilateral action, and believing that the restraints are procompetitive and Quadvest is better off for joining the scheme.

Despite the Lone Star rule being invalidated, SJRA continues to insist Quadvest is required to pay pumpage fees, and that the participants' cost of water remain equal.[99] SJRA takes the position the Joint GRP and GRP Contract "go hand in hand" and require it to continue administering the Joint GRP and enforcing the GRP Contracts with the aim of achieving compliance with the void Lone Star regulation.[100]  Following SJRA's refusal to end enforcement of the challenged GRP Contract provisions, Quadvest brought this lawsuit challenging the Joint GRP and GRP Contract provisions under federal antitrust law.

---

[96] ROA.15419-20, 17530.
[97] ROA.14309.
[98] ROA.13788-89, 18107.
[99] ROA.8280.
[100] ROA.14467-71.

SJRA initially sought state action immunity.  It argued that, in authorizing SJRA to enter into water contracts and projects, the Texas Legislature intended to displace competition in the Montgomery County wholesale water market.  The district court and this Court rejected that argument.  The Court held SJRA's authority to participate in the market did not allow it to displace competition in violation of antitrust law.[101]

After reassignment, a bench trial was held on Quadvest's claim that SJRA violated the Sherman Act by entering into and enforcing the Joint GRP and challenged provisions of the GRP Contract.[102]  During trial, the court raised questions about SJRA's briefing on the Joint GRP and GRP Contracts being a production joint venture agreement.  The court asked both sides to submit briefs on how to analyze a production joint venture agreement for antitrust.[103]  The court also had both sides submit revised proposed findings of fact and conclusions of law.[104]  The court subsequently entered judgment in favor of SJRA, and essentially adopted wholesale SJRA's proposed findings and conclusions.[105]

The court's judgment was based on several key legal conclusions.  First, it believed Quadvest cannot prove an antitrust injury based on the lost profits caused by the GRP Contract because, without obtaining compliance, the Lone Star fines would

---

[101] *Quadvest, L.P.*, 7 F.4th at 347-48.
[102] The case was originally assigned to Judge Vanessa D. Gilmer.  Following her retirement, the case was reassigned to Judge George C. Hanks, Jr. for trial.
[103] ROA.15111-13, 15345-49.
[104] ROA.16053.
[105] ROA.13194-13300.

have driven it out of business.[106]    Second, the court decided the GRP Contract provisions should not be analyzed as horizontal price-fixing or market allocation agreements, but as unilateral conduct by SJRA or permissible vertical agreements. Because it found the GRP Contract to be unilateral conduct, the court concluded it was not subject to antitrust scrutiny.[107]    Third, it found the challenged restraints were ancillary, and that Quadvest could not prove they violated antitrust law under the rule of reason.[108]

---

[106] ROA.13272-79.
[107] ROA.13279-82.
[108] ROA.13285-96.

## SUMMARY OF ARGUMENT

The Joint GRP and GRP Contracts brought together 80 water utilities in Montgomery County, with the agreement to raise prices by equalizing their costs and allowing SJRA to choose which customers it would serve to the exclusion of others. The GRP Contract provisions are per se illegal horizontal price fixing and market allocation restraints, and violate §1 of the Sherman Act.

While there is undisputed evidence Quadvest suffered lost profits and impaired competitive bidding from the GRP Contract provisions, the district court concluded Quadvest cannot seek injunctive relief because it benefited from joining the Joint GRP. An antitrust plaintiff is not barred by the fact it participated in the defendant's scheme, and whether it benefited is immaterial to whether it suffered a cognizable antitrust injury. The court's approach misconstrues the antitrust injury requirement by focusing on the competitors, instead of protecting competition.

The price-fixing and market allocation restraints created by the GRP Contract are the direct result of the concerted action of SJRA, Quadvest, and the other participants of the Joint GRP. The court found the challenged constraints avoid the reach of the Sherman Act by relying on law relevant to a single entity's unilateral conduct. Properly applying a functional analysis shows the agreement joined together independent decisionmakers, eliminating actual and potential competition, and constitutes concerted action.

20

SJRA's Joint GRP and GRP Contract provisions constitute a per se illegal horizontal price fixing and market allocation agreement among the participating utilities. The court found the contracts should be considered vertical constraints. But SJRA and Quadvest are not part of any distribution chain, and their agreement cannot be considered vertical. The court also believed the restraints escape per se treatment because it found Quadvest failed to prove specific instances of competition with SJRA. But proof of specific competition is not required. Rather the question is whether SJRA and Quadvest (and the other GRP utilities) actually or potentially could compete by seeking to provide the same services—a test easily met here.

The price neutrality and market allocation provisions are classic examples of illegal anticompetitive restraints. By using the pumpage fees to equalize production costs for participants, the price neutrality provisions fix an artificial floor limiting the ability of participants to negotiate. The mandatory connection provisions give SJRA the power to decide which participants are required to purchase its water, and it exercised that power to allocate the largest groundwater users to itself.

The intended and actual result of these restraints was to increase prices, decrease output, and harm competition. The restraints cannot avoid per se condemnation. But even under the rule of reason, a quick look confirms they are anticompetitive and cannot survive review. The antitrust laws do not allow actual or potential competitors to reject competition whenever it is in their own economic interests to do so.

21

**ARGUMENT**

## I. The judgment rests on a series of legal conclusions regarding antitrust law that the Court reviews de novo.

This appeal revolves around several legal conclusions adopted by the district court about the proper scope and application of antitrust law under the Sherman Act. Following a bench trial, the Court reviews conclusions of law de novo. Findings of fact are reviewed for clear error. *Hess Corp. v. Schlumberger Tech. Corp.*, 26 F.4th 229, 232–33 (5th Cir. 2022). Factual findings have never been considered conclusive, and are "clearly erroneous" when, reviewing all of the evidence, the Court is left with the definite and firm conviction that a mistake has been made. *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). The district court's conclusions on such things as antitrust injury, the standard to analyze collaboration between competitors, and whether the challenged constraints are horizontal price-fixing and market allocation restraints are legal determinations subject to de novo review.

## II. Quadvest's lost profits and impaired competitive bidding is the type of antitrust injury the law seeks to prevent, and provide standing without regard to any benefit of joining the Joint GRP.

The district court concluded Quadvest—because it purportedly benefited overall financially by participating in SJRA's Joint GRP—failed to prove an antitrust injury based on its lost profits or impaired competitive bidding.[109] Suffering an antitrust injury is a threshold standing requirement for an antitrust plaintiff. *Chandler v. Phoenix Servs.,*

---

[109] ROA.13272-79, ¶¶12-30.

*L.L.C.*, 45 F.4th 807, 814 (5th Cir. 2022).  Antitrust standing is a question of law the Court reviews de novo.  *PharmacyChecker.com LLC v. LegitScript LLC*, 137 F.4th 1031, 1036 (9th Cir. 2025).  Quadvest's lost profits and impaired competitive bidding are exactly the type of antitrust injury the law protects against.  The law allows a participant to litigate antitrust claims, even if they benefited from the defendant's illegal scheme. Quadvest has standing to seek injunctive relief from the GRP Contract restraints.

An antitrust injury is the type of injury the antitrust laws were intended to prevent and that flow from that which makes the defendant's conduct unlawful.  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."  *Id.*  It should be "the type of loss that the claimed violations . . . would be likely to cause."  *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125 (1969).  Antitrust standing turns on whether "the plaintiff's demand for relief ultimately serves the purposes of antitrust law to increase consumer choice, lower prices, and assist competition, not competitors."  *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 306 (5th Cir. 1997).

The undisputed evidence at trial was that, as a result of SJRA's pumpage fees, the price of water in Montgomery County doubled, wholesale water demand dropped, and Quadvest suffered $3.7 million in lost sales.[110]  Lost revenue caused by the

---

[110] ROA.13807, 14641-42, 15265, 15270-71, 15273.

defendant's anticompetitive acts or agreement is sufficient to prove an antitrust injury. *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 491-95 (5th Cir. 2022).

There was also undisputed evidence SJRA's Joint GRP and GRP Contract provisions impair Quadvest's ability to effectively bid for wholesale water customers. Losing out on customers because of anticompetitive practices that prevent a "fair fight" in the marketplace is a textbook antitrust injury. *Id.* at 491. The pumpage fees erase any competitive price advantage Quadvest can offer.[111] *See id.* at 491-94 (holding unfair pricing claim satisfied antitrust injury). And the mandatory connection and put-option preclude Quadvest from competing to provide wholesale water to the largest water users in Montgomery County.[112] *Id.* at 495 (holding exclusive-dealing arrangement satisfied antitrust injury). S*ee also Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 740 (5th Cir. 2015).

Despite the lost sales and impaired competitive bidding, the court concluded Quadvest could not prove an antitrust injury because it believed Quadvest benefited overall from joining the Joint GRP. The court focused on the fact that signing SJRA's GRP Contract was Quadvest's best option to comply with Lone Star's regulations, and it would have gone out of business if it did not comply. The court concluded Quadvest would have seen no profit and been unable to compete at all, if it had not joined SJRA's

---

[111] ROA.13811-14, 14333, 14368-69, 14374, 14437.
[112] ROA.13835-36, 14476-78, 14643-44, 16263-64, 16267-68.

24

Joint GRP by signing the GRP Contract. This approach improperly ignores any actual antitrust injury, so long as the participant benefited overall from their role in the defendant's illegal scheme.

An antitrust plaintiff is not barred from bringing a claim by the fact they participated in the defendant's scheme in order to obtain a business opportunity or more profits. *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968). In *Greene v. Gen. Foods Corp.*, the Court upheld a verdict on a Sherman claim brought by a distributor who acquiesced in or was coerced into participating in the defendant's nation-wide price fixing scheme. 517 F.2d 635, 646 (5th Cir. 1975). For 17 years, the plaintiff was a knowing and willing participant in the scheme, which was a mutually beneficial relationship in which he "cheerfully accepted" his role and the profits earned through it. *Id.* at 645-46. But individually benefiting from the scheme does not mean it causes no antitrust injury.

Whether an antitrust plaintiff benefited overall by participating in the illegal scheme is immaterial to determining whether it suffered a cognizable antitrust injury. The antitrust injury requirement "fleshes out the basic idea that '[t]he antitrust laws were enacted for the protection of *competition*, not *competitors*.'" *Pulse Network, L.L.C.*, 30 F.4th at 488. The purpose of the requirement is to "ensure[] that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990). And

25

regardless of whether the plaintiff benefited financially from the scheme, "the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws." *Perma Life Mufflers*, 392 U.S. at 139.

As such, "the degree of profitability or its lack resulting from an alleged antitrust violation should play no part in the determination whether the plaintiff's suit should be barred on equitable grounds." *Greene*, 517 F.2d at 645-46. "Such considerations, when proper at all, are at best relevant only to the quantum of damages recoverable." *Id.* The inquiry into whether a plaintiff suffered an antitrust injury is distinguishable from the question of damages, and "difficulty in computing damages is no bar to standing." *Jayco Sys., Inc. v. Savin Bus. Machs. Corp.*, 777 F.2d 306, 314 n.21 (5th Cir. 1985).

The overall financial benefits of participating in the scheme are even less relevant when, like here, the plaintiff seeks only injunctive relief, not damages. The requirement to prove an antitrust injury is relaxed for a plaintiff seeking injunctive relief. *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 319 n.10 (5th Cir. 2009). While seeking damages requires a plaintiff show actual injury, standing to seek injunctive relief only requires plaintiff show a "threatened" antitrust injury. 15 U.S.C. §26; *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109-12 (1986). Even if the plaintiff has yet to suffer any actual injury, standing is satisfied by "a significant threat of injury from an impending

26

violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp.*, 395 U.S. at 130.

The undisputed evidence of lost profits and impaired competitive bidding is more than sufficient. Quadvest has been, and continues to be, threatened with loss or damage the type of which the antitrust laws were designed to prevent, and which flow from that which makes SJRA's acts unlawful. *Cargill*, 479 U.S. at 113. Contrary to the district court's approach, there is no additional requirement that an antitrust plaintiff have not benefited overall from participating in the defendant's illegal scheme.

**III.    The Joint Group and GRP Contract provisions are an illegal concerted action joining 80% of the wholesalers in Montgomery County to fix water prices and allocate the market.**

Through its Joint GRP and the challenged provisions of the GRP Contract, SJRA brought together 80 independent public and private water utilities in Montgomery County to agree on equalizing costs, increasing prices, and allocating the market. This type of concerted action is prohibited by §1 of the Sherman Act. These agreed to horizontal constraints among competitors must be reviewed as *per se* violations of the Sherman Act, regardless of any purported economic or societal benefit the participants seek to achieve. *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 351 n.23 (1982).

But the district court found the challenged constraints avoid the reach of the Sherman Act by relying on law relevant to a single entity's unilateral conduct.[113]

---

[113] ROA.13279-82, 13288, 13295.

Recognizing the legal distinction between unilateral and concerted conduct is necessary for a proper understanding of the reach of §1. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984). Properly applied, SJRA's Joint GRP and the challenged provisions of the GRP Contract are concerted conduct within §1 of the Sherman Act.

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . ., or conspiracy" that results in an unreasonable restraint of trade. 15 U.S.C. §1; *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018). Thus, §1 applies to bar unreasonable restraints of trade created by concerted action of separate decisionmakers. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190, 195 (2010). But §1 does not reach "wholly unilateral" conduct by a single entity. *Copperweld Corp.*, 467 U.S. at 768. By contrast, §2 of the Sherman Act covers concerted and independent action, but only applies when it threatens monopolization. *Am. Needle,* 560 U.S. at 190.

This distinction reflects recognition that concerted action is inherently fraught with anticompetitive risk because "[i]t deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands." *Copperweld Corp.*, 467 U.S. at 768-69. Concerted action is judged more strictly than unilateral behavior. *Am. Needle*, 560 U.S. at 190-91. Section 1 prohibits concerted action that creates an unreasonable restraint on trade, even if it does not threaten monopolization. *Id.*

Substance, not form, determines whether the conduct involved is covered by §1. *Id.* at 195. The Court must apply a functional analysis of how the parties involved in

28

the anticompetitive conduct actually operate. *Id.* at 191-92. The key is whether the "contract, combination . . . , or conspiracy" joins together "separate decisionmakers," i.e., "separate economic actors pursuing separate economic interests." *Id.* at 195; *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 328 (5th Cir. 2015). If the agreement joins together "independent centers of decisionmaking," and deprives the market of actual or potential competition, then the claim involves concerted action. *Am. Needle*, 560 U.S. at 190-91.

SJRA's Joint GRP and GRP Contracts deprived the market of actual or potential competition and constitutes concerted action. The Joint GRP was joined by 80 independent utilities in Montgomery County.[114] These utilities each signed an individual GRP Contract knowing every other participating utility was signing a contract with identical terms.[115] The contracts recognized the individual utilities were joining a single Joint GRP.[116] And the contract expressly recognized pumpage fees would be set to equalize the costs of all participants for producing water, and that SJRA would be able to choose customers required to connect to its water supply.[117] Thus, the price-fixing and market allocation restraints were the direct result of the concerted action of SJRA, Quadvest, and the other participants of the Joint GRP.[118]

---

[114] ROA.14646.
[115] ROA.14596, 16244.
[116] ROA.16250 §2.02.
[117] ROA.13738, 14628-29, 14702-03, 16251; *see also supra* n. 113.
[118] Quadvest's claim that the challenged constraints in the GRP Contract are anticompetitive and violate the Sherman Act must be properly evaluated within the broader context of the Joint GRP. In

29

The concerted action did not end when participants signed on to the Joint GRP. The GRP Contract also created a review committee, made up of representatives from Joint GRP participants, that plays an active role.[119] SJRA submits its proposed GRP budget to the committee for input and a vote.[120] The pumpage and surface water rates charged under the GRP contracts are first proposed to the committee.[121] And SJRA has never gone against a vote or recommendation of the committee.[122]

Despite the participants' concerted action, the court based its legal conclusions on inapplicable law related to actions by a single entity. For example, it relied on *Texaco, Inc. v. Dagher*,[123] to conclude the Joint GRP and GRP Contracts pricing "may be price fixing in a literal sense, [but] it is not price fixing in the antitrust sense."[124] But *Texaco* involved whether it was illegal "for a lawful, economically integrated joint venture to

---

footnotes 1 and 2 of the findings of fact and conclusions of law, SJRA inserted and the court adopted language that could suggest the court could not consider the GRP Contract in the context of the Joint GRP based on waiver. Quadvest filed a timely motion to alter or amend the language arguing that: (1) it can be misread as to the claim Quadvest asserted regarding the Joint GRP; (2) SJRA was on notice of Quadvest's claim and any suggestion of waiver is unsupported by the proposed JPO, the pleadings, or the trial; and (3) alternatively, Quadvest's claim was tried by consent. ROA.13309-29. In response, SJRA acknowledged that "[a]t no point did the Court hold that any claim, or element of a claim, failed due to waiver." ROA.13581-82. The court denied the motion, finding it was not manifest error and that the proposed amendments would not affect the judgment. ROA.13601-03. After admitting it was not the basis of the court's ruling, SJRA should not be heard to argue waiver on appeal. Moreover, any suggestion of waiver is incorrect as a matter of law.

[119] ROA.16252-53, §2.06., 13207-08 at ¶¶108-09.

[120] ROA.16255, §2.10(9), 13257-58 ¶222.

[121] ROA.16255, §2.10(8), 13258 ¶224.

[122] ROA.13258 ¶223, 14599-600.

[123] 547 U.S. 1 (2006).

[124] ROA.13286 ¶57. Likewise, the court relied on a case involving a parent company and wholly owned subsidiary, *Copperweld*, 467 U.S. at 768, as well as cases involving a franchisor and franchisee. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3rd Cir. 1997); *Schlotzsky's, Ltd. v. Sterling Purchasing and Nat. Distribution Co.*, 520 F.3d 393 (5th Cir. 2008). ROA.13288 ¶63.

set the prices at which the joint venture sells its products." 547 U.S. at 3. Under a joint venture agreement, Texaco and Shell Oil agreed to end competition, pool their resources to sell gasoline through a new entity, and share the risks and profits of their venture. *Id.* That did not happen here.

It is undisputed SJRA and Quadvest are not involved in a joint venture.[125] Instead, they and the other Joint GRP participants simply agreed contractually to be bound by the challenged restraints. The fact the parties reduced their agreement to writing does not remove it from the scope of the Sherman Act.

In *Arizona v. Maricopa County Medical Society*, the Supreme Court struck down an agreement reached between nonprofit medical foundations as to maximum fees physicians would charge under a fee-for-service medical service plan. 457 U.S. at 339. The Court made a clear delineation between a contract between competitors and a single entity. "The foundations are not analogous to partnerships or other joint arrangements in which persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit." *Id.* at 356. Likewise, the Joint GRP participants remain separate entities, do not share ownership of the water treatment plant, and cannot be considered as a single entity.

The district court also repeatedly cites the Supreme Court's holding in *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, to support its belief that under the Sherman

---

[125] ROA.13888, 14700, 15850, 15990-91.

31

Act, "business are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."[126]  555 U.S. 438, 448 (2009).  But *Pacific Bell Telephone* applies the *Colgate* doctrine to a §2 monopoly claim against a single entity. *Id.*  This Court previously held the *Colgate* doctrine is inapplicable to a §1 claim involving concerted action.  *St. Bernard Gen. Hosp., Inc. v. Hosp. Serv. Ass'n of New Orleans, Inc.*, 712 F.2d 978, 987 (5th Cir. 1983).  The district court's reliance on *Pacific Bell Telephone* to reject Quadvest's §1 claims is improper.

The cases the court relied on are about conduct that did not warrant §1 scrutiny because it involved coordination that "does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests." *Copperweld*, 467 U.S. at 770-71.  But that is not what happened here.

SJRA's Joint GRP and GRP Contracts are a collaboration between independent competitors.  The Federal Trade Commission and Justice Department have explained that "[a] 'competitor collaboration' comprises a set of one or more agreements, other than merger agreements, between or among competitors to engage in economic activity, and the economic activity resulting therefrom."  U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for Collaborations Among Competitors*, §1.1 (2000).  "The mere coordination of decisions on price, output, customers, territories, and the like is not integration, and cost savings without integration are not a basis for avoiding per se

---

[126] ROA.13279-81.

condemnation." *Id.* at §3.2. Participants to the Joint GRP made multiple agreements, but they remain non-integrated competitors in the Montgomery County water market. The Joint GRP and GRP Contracts are concerted action that cannot avoid §1 scrutiny.

**IV.    The cost equalization and mandatory connection provisions of the GRP Contract are horizontal price-fixing and market allocation agreements that are per se unlawful.**

SJRA's Joint GRP and GRP Contracts brought together 80 independent water utilities in Montgomery County, with the express agreement to raise prices by equalizing their cost of production and allow SJRA to allocate which customers it would serve. These were not "bugs" in the contract—they were features. SJRA believed no one would buy its surface water unless the price was the same, and it could not ensure customers would sign up for surface water long term, unless it could mandate connection.[127] Regardless of its reasons, the Joint GRP and GRP Contract provisions created an illegal horizontal price fixing and market allocation agreement among the participating utilities.

**A.    The Joint GRP and GRP Contract create horizontal restraints on the participating utilities.**

In signing the identical GRP Contracts, the 80 participants agreed they would all be bound by the same cost equalization and market allocation provisions. By participating in an association that prohibits its members from competing against each other on the basis of price or for parts of the market, the GRP Contract participants

---

[127] ROA.14203-04, 14484, 14628-30, 14703.

created horizontal restraints—"an agreement among competitors on the way in which they will compete with one another." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99 (1984). These kind of horizontal price-fixing and market allocation restraints are unreasonable per se.

The district court, however, accepted SJRA's argument that, even if the GRP Contract provisions fixed prices and allocated the market, they should be considered vertical restraints.[128] Vertical agreements are those between entities at different levels of a distribution chain. *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1035 (5th Cir. 2023). But SJRA and Quadvest are not part of any distribution chain—they are both water wholesalers. Because SJRA and Quadvest both operate on the same level of production, their agreement is not vertical. *Id.* at 1036.

Instead, SJRA used its Joint GRP to band together water wholesalers—SJRA, Quadvest, and other water utilities—who would otherwise be horizontal competitors. *U.S. v. All Star Indus.*, 962 F.2d 465, 471-73 (5th Cir. 1992). The fact the restraints were enacted through individual contracts with SJRA acting as the "middleman" does not change that the restraints are horizontal in nature and subject to the per se rule. *Id.* at 473. That is true even though SJRA "conceptualized the conspiracy" and "orchestrated it by bringing the distributors together around contracts it held." *Id.*

---

[128] ROA.13280 ¶37, 13282 ¶42.

The court also believed the restraints escape per se treatment because it found Quadvest failed to prove specific instances of competition between itself and SJRA.[129] But proof of specific instances of competition is not required. Rather the test is whether SJRA and Quadvest (and the other GRP utilities) compete by seeking to provide the same services. *Maricopa Cnty. Med. Soc.*, 457 U.S. at 356 (applying per se rule to price-fixing restraint based on the fact that association's doctors "compete with one another for patients"). *See also, N. Tex. Specialty Physicians v. F.T.C.*, 528 F.3d 346, 357 (5th Cir. 2008) (holding "competitors" for antitrust purposes was satisfied when conspiracy members have "substantially similar economic interests" and compete with other similar providers). "Absence of actual competition may simply be a manifestation of the anticompetitive agreement itself." *Am. Needle,* 560 U.S. at 198.

Moreover, the antitrust restrictions on collaborations between competitors, "encompasses both actual and potential competitors." U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for Collaborations Among Competitors*, §1.1 (2000). As such, the Supreme Court has made clear that a market allocation agreement is per se illegal even when the participants "had never competed in the same market, but had simply agreed to allocate markets." *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 (1990).

The proper analysis of the SJRA constraints should be similar to that applied by the Fourth Circuit, more than 75 years ago, to contractual restraints in a wholesale

---

[129] ROA.13284-85 ¶¶51-56.

electric power agreement between two utilities. *Penn. Water & Power Co. v. Consol. Gas, Elec. Light & Power Co.*, 184 F.2d 552 (4th Cir. 1950). Both Penn Water and Consolidated were engaged in the generation, transmission, and sale of electric power. *Id.* at 555. In the process of financing the construction of a hydro-electric plant, the utilities signed a 49-year contract that gave Consolidated the right to all of the electric power Penn Water could generate, and required Penn Water receive approval from Consolidated for any new power contract. *Id.* at 556-58.

But for the agreement, Penn Water and Consolidated would have been potential competitors in the electric market. *Id.* at 556. The Fourth Circuit held the contract was a per se violation of §1 of the Sherman Act because it allowed Consolidated to fix Penn Water's contract prices and determine to which customers Penn Water might sell. *Id.* at 558. The same is true of the challenged GRP Contract provisions. They create horizontal restraints on how the parties compete.

### B.    The pumpage fee and rate provisions—designed to create "price neutrality"—are per se illegal horizontal price fixing.

Price is considered the "central nervous system of the economy," and any agreement that interferes with the setting of price by free market forces is illegal on its face. *Nat'l Soc. of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 693 (1978). The GRP Contracts' pumpage fees and rate provisions do exactly that by equalizing the participants' costs to produce water.[130] The intent of the provisions is to create "price neutrality" between

---

[130] ROA.13738, 16251 §2.02(b), 16276-78 §§6.02 6.04.

the Joint GRP participants.[131]   This type of horizontal price fixing is "perhaps the paradigm of an unreasonable restraint of trade." *Bd. of Regents*, 468 U.S. at 100.   The provisions should be held invalid, as unreasonable per se horizontal price-fixing restraints on competition.

The district court, however, believed the price neutrality provisions were not price-fixing within the scope of §1 of the Sherman Act.   The court reasoned that, because the agreement only fixed the cost of water between participants, and not the ultimate price a participant could charge as a wholesaler, it should not be prohibited.[132] But that approach conflicts with well-settled antitrust law.

The law has long recognized that "price-fixing includes more than the mere establishment of uniform prices." *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940).   Under the Sherman Act, "any combination which tampers with price structures is engaged in an unlawful activity. *Id.* at 221.   A "combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity" is per se illegal.   *Id.* at 223.   The machinery employed to achieve that end is immaterial.   *Id.*   It includes, like here, when the result of the agreement has the effect of placing a "floor" on prices.   *Id.* at 219.

---

[131] ROA.14479-80, 14568.
[132] ROA.13250-51 ¶¶194-95, 13260 ¶239, 13269 ¶289, 13280 ¶¶35-36.

37

The pumpage fees are set to equalize production costs for participants. Groundwater participants are charged pumpage fees—now higher than the actual cost to produce groundwater—that they then have to pass on in the form of higher rates. At the same time, SJRA's rate to produce surface water is subsidized, and any competitive pricing advantage a groundwater wholesaler might have vanishes.[133] While a wholesaler can still negotiate a final contract price, it does so with an agreed cost floor set by the participants, not the free market.

"Competition was not eliminated from the markets; but it is clearly curtailed," because the GRP Contract provisions "obviously reduced the play of the forces of supply and demand." *Id.* at 220. Once a price-fixing agreement is proven, there is a conclusive presumption it falls within the statute. *Maricopa Cnty. Med. Soc.*, 457 U.S. at 344-45. The court was wrong to conclude the pumpage fees and other price neutrality provisions in the GRP Contract are not price-fixing within the scope of §1.

Horizontal price-fixing agreements are ordinarily condemned as per se illegal because they "always or almost always tend to restrict competition and decrease output." *Bd. of Regents*, 468 U.S. at 100. That is the result SJRA's GRP Contract produced—the price of water in Montgomery County doubled, while demand dropped.[134] There was no increase in output; the production of surface water just

---

[133] *See supra* nn. 66, 112.
[134] ROA.13787, 13814, 14640-43, 15267-68, 15787.

displaced groundwater.[135]  The price-fixing scheme created by the Joint GRP and GRP

Contract is a horizontal pricing agreement that is per se illegal under §1.

C.    **The Mandatory Connection and Surface Water Put Option provisions—allowing SJRA to dictate who it sells water to—are per se illegal horizontal market allocation.**

An agreement between competitors to allocate customers and minimize

competition is one of the "classic examples" of anticompetitive actions that are a per

se violation of §1.  *U.S. v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972).  The Mandatory

Connection and Surface Water Put Option in SJRA's GRP Contract do exactly that.

The provisions give SJRA the power to decide which participants are required to

purchase its surface water.[136]  SJRA exercised that right, making the largest groundwater

users its customers.[137]

Relying on *Pacific Bell Telephone*'s application of the *Colgate* doctrine, the district

court held SJRA was free to choose whom it would deal with and did not allocate

customers within the scope of §1.[138]  But that approach misconstrues Quadvest's claim

and settled antitrust law.

An agreement "to allocate or divide customers between competitors within the

same horizontal market constitutes a per se violation of §1 of the Sherman Act."  *U.S.*

*v. Suntar Roofing, Inc.*, 897 F.2d 469, 473 (10th 1990).  While the court inexplicably held

---

[135] ROA.15156-58, 15207-08.

[136] ROA.16263 §4.05; 16267-68 §4.09 (a), (b), (d).

[137] ROA.13785-86, 14706, 14284-85, 15450-51.

[138] ROA.13280-82 ¶¶ 38-43.

the GRP Contract did not "allocate" Quadvest, that was neither the claim nor evidence presented. The court acknowledged that Quadvest alleged the provisions gave SJRA the ability to allocate to itself which of the participating LVGUs would receive SJRA's surface water.[139] Quadvest and SJRA are both water wholesalers in Montgomery County.[140] Thus, the mandatory connection provisions are a horizontal market allocation agreement allowing SJRA to divide up customers.

An agreement between utilities to allocate territories or customers, when the state has not granted authority to do so, is a horizontal market allocation in violation of §1. *Gainesville Utils. Dep't v. Florida Power & Light Co.*, 573 F.2d 292, 299-300 (5th Cir. 1978). *See also*, *Penn. Water & Power Co.*, 184 F.2d at 558. In *Gainesville Utilities*, the Court reversed a jury verdict and held as a matter of law that two utilities entered into a per se illegal market allocation agreement when they denied a municipal power company's request to connect without an agreement on service territories. *Gainesville Utils. Dep't*, 573 F.2d at 294-99. Since the state had not authorized a territorial arrangement, the Court held the utilities were not exempt from federal antitrust law to create one on their own. Applying the per se standard was appropriate to "insure that the market is free of territorial restraints." *Id.* at 300. The same rule should apply here.

---

[139] ROA.13280-81 ¶38.
[140] ROA.13810, 14627.

40

The Court already held the Texas Legislature did not authorize SJRA to displace competition in the wholesale water market. *Quadvest, L.P.*, 7 F.4th at 347-48. Horizontal market allocation agreements are per se anticompetitive regardless of whether the entities ever competed in the same market or agreed to split a market in which they both do business. *Palmer*, 498 U.S. at 49-50. "Horizontal territorial divisions almost invariably reduce competition among the participants." *U.S. v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1086 (5th Cir. 1978). "When competition is reduced, prices increase and unit sales decrease." *Id.* That is exactly what has happened in Montgomery County—water prices doubled and sales dropped. The Mandatory Connection and Surface Water Put Option created by the Joint GRP and GRP Contract is a horizontal allocation agreement that is per se illegal under §1.

The court alternatively found Quadvest's market allocation claim is moot because SJRA represented to the court that it will not try to force Quadvest to connect now that the Lone Star reduction requirements are not in place.[141] But SJRA's assurances do not resolve the parties' dispute or moot Quadvest's claims.

SJRA's verbal assurances it will not require Quadvest to connect without a regulatory reduction rule in place do not moot the issue. A defendant's voluntary cessation of the challenged practice does not deprive a federal court of its power to determine the legality of the practice. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,

---

[141] ROA.13282 ¶43.

41

528 U.S. 167, 189 (2000). If it did, the courts would be compelled to leave the defendant free to return to his old ways. *Id.* "The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement." *U.S. v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953). Instead, the law recognizes that a "controversy may remain to be settled in such circumstances, e.g., a dispute over the legality of the challenged practice." *Id.* And the courts retain the power to hear the case and grant injunctive relief. *Id.* at 633.

The test in this situation imposes a heavy burden on the party asserting mootness. *Friends of the Earth*, 528 U.S. at 189. "[V]oluntary cessation of a challenged practice does not moot a case unless subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 457 n.1 (2017). This same burden applies to a government defendant. *Id.*; *Tucker v. Gaddis*, 40 F.4th 289, 292-93 (5th Cir. 2022). The district court's analysis points to nothing other than SJRA's bare assurances. As such, SJRA failed to carry its "heavy burden" of proving mootness.

Regardless, whether SJRA will try to force Quadvest to connect in the future does not moot whether the mandatory connection provisions are illegal horizontal market allocation restraints as currently enforced. SJRA has existing connections with the largest water users in Montgomery County it secured through the GRP Contract provisions. SJRA continues to insist it can and will enforce the GRP Contract

42

provisions against existing participants,[142] foreclosing Quadvest's ability to sell groundwater to those participants. In its complaint, Quadvest alleged "SJRA's contractual ability to force competitors to purchase [] water from SJRA in amounts dictated by SJRA is an unreasonable restraint of trade."[143] It also alleged SJRA's continued enforcement of the GRP Contracts destroys competition by permitting SJRA to "dictate who will buy surface water from it and in what quantities."[144] Quadvest sought injunctive and declaratory relief that the GRP Contracts were illegal and unenforceable.[145] Because Quadvest sought declaratory and injunctive relief regarding the existing enforcement of the GRP Contracts, SJRA's assurances about future connections does not moot the issue of the provision's legality. *U.S. v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 202-03 (1968).

### D. The price-fixing and market allocation restraints were not necessary to create a new product and cannot escape the per se rule.

The district court concluded that, if the pumpage fees and mandatory connection provisions of the GRP Contract are restraints on competition, they were reasonably necessary for the participants' joint venture and should be reviewed under the rule of reason.[146] But the ancillary restraints doctrine applies only to a narrow, limited circumstance in which the restraints on competition are essential if the product being

---

[142] ROA.14467-71.
[143] ROA.6518.
[144] ROA.6530.
[145] ROA.6528.
[146] ROA.13285-87 ¶¶57-61.

produced is going to be available at all. *U.S. v. Apple, Inc.*, 791 F.3d 290, 325-26 (2nd Cir. 2015). That is not true here. The Joint GRP and GRP Contract were not necessary to, and did not, create any new product. Rather, they created a funding mechanism to produce the same product—drinking water—in a different way. The antitrust laws do not allow competitors to fix prices and allocate markets whenever it is in their economic interests to do so, and then avoid per se scrutiny.

The fact the Joint GRP participants choose to collaborate for their own financial best interests has no effect on whether the restraints imposed are anticompetitive. Even joint ventures have no immunity from antitrust laws. *Bd. of Regents*, 468 U.S. at 113. "Indeed, a joint venture with a single management structure is generally a better way to operate a cartel because it decreases the risks of a party to an illegal agreement from defecting from that agreement." *Am. Needle*, 560 U.S. at 202. "[C]oncentrating too much power in the hands of those controlling a joint venture or other joint integrative activity can create significant competitive hazards, particularly if the participants are actual or potential competitors." WILLIAM HOLMES & MELISSA MANGIARACINA, ANTITRUST LAW HANDBOOK §2:22 (Nov. 2023 Update). "In particular, the activity may be misused as a subterfuge to impose illegal competitive restraints on the venturers themselves." *Id.* That is exactly what has happened here: SJRA used the Joint GRP and GRP Contract provisions to create and control a contractual water cartel affecting 80% of the water sold in Montgomery County.

44

The Supreme Court has recognized that not all arrangements between actual or potential competitors are per se violations of the Sherman Act or even unreasonable restraints. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979). However, to avoid per se review, it is "critical that th[e] case involves an industry in which horizontal restraints on competition are essential if the product is going to be available at all." *Bd. of Regents*, 486 U.S. at 101. Only when the restraints on competition are essential for the product to be available at all are the per se rules inapplicable and the restraints judged according to the rule of reason. *Am. Needle*, 560 U.S. at 203.

In *Arizona v. Maricopa County Medical Society*, the Supreme Court rejected a similar attempt to claim the per se rules should not apply to a price-fixing agreement between potential competitors. It applied the per se rule to strike down an agreement reached between nonprofit medical foundations as to maximum fees physicians would charge under a fee-for-service medical service plan. 457 U.S. at 339. The Court distinguished the scenario from *Broadcast Music*, in which it recognized the limited exception in which the ancillary restraints doctrine applies. In *Broadcast Music*, the agreement "did not place any restraint on the right of any individual copyright owner to sell his own compositions separate to any buyer at any price." *Id.* at 355. Instead, it involved the sale of a blanket license that was "entirely different from the product that any one composer was able to sell by himself." *Id.*

45

Recognizing the two situations were "fundamentally different," the Court rejected application of the relaxed rule because "[t]heir combination in the form of the foundation does not permit them to sell any different product." *Id.* at 356. Instead, "[t]heir combination has merely permitted them to sell their services to certain customers at fixed prices and arguable to affect the prevailing market price." *Id.* The same is true here.

The GRP Contracts were not necessary to, nor did they, create any new product that was not otherwise available. SJRA's sale of surface water is not a new product. There is no dispute that treated groundwater and treated surface water are identical and indistinguishable to the consumer.[147] SJRA's surface water merely displaced existing groundwater usage, and without it, groundwater usage would fill in.[148]

If surface water was somehow considered a "new" product, SJRA's own representative, Jace Houston, testified that SJRA and others could have produced surface water without creating the GRP Contract.[149] SJRA's economist also agreed the Joint GRP could have been constructed differently, such as a true joint venture in which all of the members owned the water treatment plant.[150] There is no evidence the challenged restraints were essential for surface water to be available.

---

[147] ROA.13804, 14625.

[148] ROA.13257 ¶218, 15156-58, 15207-08, 15351-52.

[149] ROA.15056-57

[150] ROA.15848-50.

Even if one reconceptualized the product produced by the GRP Contracts as "compliance" with the Lone Star reduction rule, the result is the same. The evidence at trial was that there were multiple avenues that different competitors could have used to achieve compliance.[151] SJRA's entire position at trial was that Quadvest did not have to join its Joint GRP in order to achieve compliance. Instead, it argued joining the Joint GRP was just the most economical way for Quadvest to obtain compliance.

The Joint GRP participants sold water to Montgomery County customers before SJRA's Joint GRP was formed, and they continue to do so today. The Joint GRP and GRP Contract restraints "do[] not permit them to sell any different product." *Maricopa Cnty. Med. Soc'y*, 457 U.S. at 356. Instead, the GRP Contracts have "merely permitted them to sell their services to certain customers at fixed prices and arguable to affect the prevailing market price." *Id.* The challenged constraints did not create any new product, and the ancillary restraints doctrine does not apply.

Even if doctrine was applicable, the court was wrong to find the price-fixing and market allocation restraints were ancillary instead of naked restraints on competition. To apply the doctrine, courts must determine whether the restriction is a "naked" restraint on trade, and thus invalid, or one that is "ancillary" to the legitimate and competitive purposes of the venture, and thus valid. *Texaco Inc.*, 547 U.S. at 7. A horizontal restraint is defined as "naked" if it "is formed with the objectively intended

---

[151] ROA.14589-90, 15059.

purpose or likely effect of increasing price or decreasing marketwide output in the short run, with output measured by quantity or quality." PHILLIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶1906a (4th ed. 2013). "By contrast, a restraint is ancillary if its objectively intended purpose or likely effect is lower prices or increased output as measured by quantity or quality." *Id.*

Whether a restraint is "naked" turns on what the "reasonably anticipated impact of the particular agreement under scrutiny—measured, of course, against the environment created by the joint venture and its essentiality to that venture." *Id.* ¶1908b, at 303-04. Here, the "reasonably anticipated impact" of the agreement was to increase the price of wholesale water and decrease output. SJRA's Houston testified it was understood the provisions would raise the price of water and reduce consumption.[152]

The court found the constraints were ancillary because it accepted the idea that without including the price-fixing and market allocation restraints no one would have voluntarily bought surface water. But to prove the provisions were permissible ancillary restraints, the evidence must show they were reasonably necessary to the parties' procompetitive collaboration. *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021). Procompetitive benefits are those intended to reduce price and increase output. *Bd. of Regents*, 468 U.S. at 114. Here, the restraints were never intended to be procompetitive.

---

[152] ROA.14640-42, 14704.

48

To the contrary, the entire point of the restraints was to eliminate any incentive or disincentive for participants to continue competing. "[W]hen there is an agreement not to compete in terms of price or output, 'no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.'" *Id.* at 109. There is no rule in antitrust law that allows competitors to agree to raise prices in the market while reducing output, but that is what the GRP Contract restraints intentionally did. As naked restraints on competition, with the clear effect of raising the price of water and decreasing consumption, the restraints are not entitled to relaxed review.

**E.    If reviewed under the rule of reason, a quick look shows that SJRA's GRP Contract price-fixing and market allocation restraints violate §1.**

Even if the price-fixing and market allocation provisions of the GRP Contract were not unlawful per se, they should still be rejected under the rule of reason "after only a quick look." *NCAA v. Alston*, 141 S.Ct. 2141, 2156 (2021). When reviewing whether horizontal restraints on competition should be allowed, the rule of reason can sometimes be applied "in the twinkling of an eye." *Bd. of Regents*, 468 U.S. 109 n.39. For example, in the *Board of Regents* case, the Supreme Court "invoked abbreviated antitrust review as a path to condemnation, not salvation." *Alston*, 141 S.Ct. at 2157. This approach makes sense when, like here, the agreements among competitors "obviously threaten to reduce output and raise prices." *Id.* at 2156.

Under the rule of reason, courts generally apply a burden-shifting framework. *Id.* at 2160. The plaintiff has an initial burden to prove the challenged restraint has a

49

substantial anticompetitive effect. Then the burden shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant makes that showing, the burden shifts back to the plaintiff to demonstrate the procompetitive efficiencies could be reasonably achieved through less competitive means. *Id.*

The district court concluded Quadvest failed to show anticompetitive effects of the restraints based on its legal conclusions that: (1) Quadvest could not show an antitrust injury because it benefited from participating in SJRA's scheme; and (2) it should apply the law relevant to single entity action.[153] As previously briefed herein, the court misconstrued the law, and these conclusions cannot withstand review.

The court also held the restraints were not anticompetitive because "SJRA developed a product—the Joint GRP—that the Joint GRP Participants demonstrably wanted."[154] The court believed the provisions helped the participants "achieve the goal of low-cost compliance with Lone Star's regulations."[155] "But illegal restraints often are in the common interests of the parties to the restraint, at the expense of those that are not parties." *Am. Needle*, 560 U.S. at 198. The antitrust laws are intended to protect competition, not competitors. *Atl. Richfield Co.*, 495 U.S. at 342. And the criterion for judging the validity of a restraint is its impact on competition. *Bd. of Regents*, 468 U.S. at 104. In this case, the anticompetitive consequences of the arrangement are apparent:

---

[153] ROA.13294-95 ¶¶80-83.
[154] ROA.13295 ¶83.
[155] ROA.13296 ¶88.

loss of individual competitors' ability to compete, higher prices, and lower output. *Id.* at 106-07. When there is an agreement not to compete in terms of price or output, no elaborate analysis is required "to demonstrate the anticompetitive character of such an agreement." *Id.* at 109.

As to SJRA's claimed procompetitive benefits, the court found the price-fixing and market allocation provisions were necessary because no one would agree to take surface water unless the prices were equal and that SJRA could not ensure future compliance if it could not control with whom it entered into long term water contracts.[156] But these are not valid procompetitive benefits—they are simply the reason SJRA claims it should be allowed to be anticompetitive. A constraint cannot simply be relabeled as a product feature to avoid §1 scrutiny. *Alston*, 141 S.Ct. at 2163.

The fact SJRA claims it cannot sell surface water without price-fixing and market allocation restraints is not a cognizable procompetitive justification under the rule of reason. *U.S. v. Am. Airlines Grp. Inc.*, 121 F.4th 209, 225 (1st Cir. 2024). Any defense of a restraint based on the notion that competition itself is inefficient or unreasonable is insufficient as a matter of law. *Id.* The "cognizable efficiencies" sufficient to support a horizontal collaboration cannot arise from anticompetitive reductions in output or services. *Id.*

---

[156] ROA.13286-87 ¶¶60-61, 13294 ¶81.

51

"In sum, the Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable." *Nat'l Soc. of Prof'l Eng'rs*, 435 U.S. at 696. The conclusion that the agreement was necessary for SJRA to secure water contracts and maintain a price at which it can sell water "confirms rather than refutes the anticompetitive purpose and effect of its agreement." *Id.* at 693. By seeking to insulate itself from the full spectrum of competition under the "assumption that the product itself is insufficiently attractive to consumers," SJRA "forwards a justification that is inconsistent with the basic policy of the Sherman Act." *Bd. of Regents*, 468 U.S. at 117. SJRA failed articulate any proper procompetitive benefit of its restraints, and they cannot survive review.

## V.    The undisputed evidence shows SJRA's Joint GRP and GRP Contracts has a substantial effect on interstate commerce.

The final element of a §1 claim is a jurisdictional requirement that the defendant's activities have "a substantial effect on interstate commerce." *Park v. El Paso Bd. of Realtors*, 764 F.2d 1053, 1063 (5th Cir. 1985). The district court found Quadvest failed to establish SJRA's violation of the Sherman Act affects interstate commerce.[157] But that is not the correct legal test.

An antitrust plaintiff need only demonstrate a substantial effect on interstate commerce generated by the defendant's activities. *Id.* There is no requirement to show the effect on interstate commerce caused by the alleged antitrust violation. *Id.* "If

---

[157] ROA.13259.

establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce, jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect. This is not the rule of our cases." *McLain v. Real Estate Bd. of New Orleans*, 444 U.S. 232, 243 (1980). As a matter of law, the court erred by applying the wrong jurisdictional standard.

But even if not, the undisputed evidence showed SJRA's Joint GRP and GRP Contracts have a substantial impact on interstate commerce. *St. Bernard Gen. Hosp., Inc.*, 712 F.2d at 984. The scope of economic activities covered by the Sherman Act is broad. It reaches "restraints that either occur in the flow of interstate commerce or that substantially affect interstate commerce." *U.S. v. Young Bros., Inc.*, 728 F.2d 682, 688 (5th Cir. 1984). "The reach of the [Sherman Act] is coextensive with the reach of congressional power under the Commerce Clause . . . .["] *Gulf Coast Hotel-Motel Ass'n v. Miss. Gulf Coast Golf Course Ass'n*, 658 F.3d 500, 504 (5th Cir. 2011). "The broad authority of Congress under the Commerce Clause . . . extend[s] beyond activities actually in interstate commerce to reach other activities, while wholly local in nature, nevertheless substantially *affect* interstate commerce." *McLain*, 444 U.S. at 241.

The undisputed evidence was that the SJRA Joint GRP included 80% of the groundwater sold in Montgomery County. SJRA's Houston admitted that all customers of a participant in the Joint GRP, including residential and commercial customers, are

53

paying higher prices for water because of the participants' agreement.[158]  Quadvest put on evidence that the pumpage fees led to higher water prices for businesses in Montgomery County, including restaurants, hospitals, and hotels.  The businesses pass the higher costs on to their customers in the form of higher prices.[159]  Quadvest also has paid SJRA millions of dollars in pumpage fees, by ACH/wire transfers from out of state financial institutions.[160]

This is more than sufficient evidence to prove SJRA's Joint GRP and GRP Contract have a substantial effect on interstate commerce.  Activity that has an economic impact on businesses in the hospitality industry, such as hotels and restaurants, affects interstate commerce and falls within the Sherman Act.  *Gulf Coast Hotel-Motel Ass'n*, 658 F.3d at 506-07.  Higher prices being charged to entities, like hospitals and others, who in turn purchase out-of-state supplies, is also sufficient to confer jurisdiction.  *St. Bernard Gen. Hosp., Inc.*, 712 F.2d at 984.  And the multimillion-dollar financing of SJRA's Joint GRP and Quadvest's payment of pumpage fees from out-of-state financial institutions and investors are interstate commerce.  *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 744 (1976).

Moreover, the Supreme Court has held groundwater is an article of commerce subject to Congress' oversight.  *Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941, 953

---

[158] ROA.14635-37.
[159] ROA.12963-68, 14976-79, 14984, 15030-31.
[160] ROA.14606-07.

54

(1982).  And any scheme that has an effect on the supply of drinking water, has an effect on interstate commerce.  *U.S. v. King*, 660 F.3d 1071, 1079-80 (9th 2011).  These are all effects that show SJRA's conduct "falls squarely within the Supreme Court's Commerce Clause jurisprudence."  *Gulf Coast Hotel-Motel Ass'n*, 658 F.3d at 505.

The district court found fault in the fact that witnesses did not have personal knowledge of whether any customers choose not to use their service based on water costs, or if the water cost themselves had a "substantial or material impact" on their business.  And the court pointed to the fact the testimony involved the effect on retail water rates.[161]  But again, that is not the correct test.

"Jurisdiction is not defeated in a case relying on anticompetitive effects by plaintiff's failure to quantify the adverse impact of defendant's conduct."  *Id.*  And jurisdiction is satisfied even by an indirect impact on interstate commerce.  *St. Bernard Gen. Hosp., Inc.*, 712 F.2d at 984.  "The Sherman Act's requirement of the effect on interstate commerce demands little more than a 'not insubstantial' effect on commerce."  *Id.*  The undisputed evidence in this case was more than sufficient to prove SJRA's Joint GRP and GRP Contracts affected interstate commerce.

---

[161] ROA.13259-60.

## CONCLUSION

For these reasons, Quadvest asks the Court to reverse the final judgment, render judgment that the challenged restraints in SJRA's GRP Contract are per se violations of the Sherman Act, and remand for the district court to enter appropriate injunctive and declaratory relief.  Alternatively, Quadvest asks the Court to reverse and remand for the district court to reconsider the legality of the restraints in light of the Court's opinion.

Dated January 15, 2026                    Respectfully submitted,


                                          /s/ Kurt Kuhn

J. David Rowe                              Kurt Kuhn
   Texas Bar No. 00794564                     Texas Bar No. 24002433
   drowe@munckwilson.com                      Kurt@KuhnAppeals.com
MUNCK WILSON MANDALA, LLP                  Kuhn Law PLLC
807 Las Cimas Parkway, Suite 300          7000 N. MoPac Expy., Suite 315
Austin, Texas  78746                      Austin, Texas  78731
(737) 201-1600                            (512) 476-6005


Aaron C. Dilbeck
   Texas Bar No. 24095723
   adilbeck@munckwilson.com
MUNCK WILSON MANDALA, LLP
2000 McKinney Ave., Suite 1900
Dallas, Texas 75201
(972) 628-3694


                        *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I, Kurt Kuhn, do hereby certify that the above and foregoing Brief of Appellants has been served via the ECF System on this the 15th day of January, 2026, to:


R. Paul Yetter
Constance H. Pfeiffer
James E. Zucker
Justin S. Rowinsky
Luke A. Schamel
YETTER COLEMAN LLP
811 Main St., Suite 4100
Houston, Texas 77002
(713) 632-8000

*Attorneys of Record for Defendant-Appellee*


                              /s/ Kurt Kuhn
                                Kurt Kuhn

                              *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because, excluding parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,879 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Microsoft Word 2019 in 14-point Garamond font.

/s/ Kurt Kuhn
Kurt Kuhn
Attorney for Appellant

Dated: 01/15/2026